IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

KENNETH WAYNE FISHER, JR.                                              PLAINTIFF

          v.                          Civil No.  16-5073

DEPUTY TERRY DEVORE; CATERING BY
MARLINS, INC. d/b/a CBM MANAGED
SERVICES; DEPUTY FOSTER; and
SERGEANT SHARP                                                        DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights claim brought by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis*.

Plaintiff is currently incarcerated in the United States Penitentiary in Terre Haute,

Indiana.  The events that are the subject to this case occurred while Plaintiff was detained in the

Benton County Detention Center (BCDC).  Plaintiff contends his First Amendment Freedom of

Religion Right was violated.  Specifically, he contends: (1) he was denied the ability to practice

his Jewish faith because he was provided with non-Kosher[1] food; and (2) he was harassed and

belittled because of his religion.

The case is before the court on the motion for summary judgment (Doc. 61) filed by

Catering by Marlins, Inc. d/b/a CBM Managed Services (CBM) and the motion for summary

judgment (Doc. 64) filed the Benton County Defendants, Deputy Terry Devore, Deputy Foster,

and Sergeant Sharp.

---

[1]Kosher is defined as food prepared or kept in conditions that follow the rules of Jewish law.
http://dictionary.cambridge.org/us/dictionary/english/kosher (accessed July 24, 2017).

-1-

To assist Plaintiff in responding to the summary judgment motions, a questionnaire (Doc. 71) was propounded. Plaintiff filed his response (Doc. 73). Thereafter, CBM filed a reply brief (Doc. 74). The motions are ready for decision.

**1. Background**

Plaintiff was booked into the BCDC on December 2, 2015. *Cty. Defts' Ex.* A-1 at 7; *Resp.* at ¶ 27. He remained incarcerated there until February 22, 2016. *Cty. Defts' Ex.* A-1 at 12. Plaintiff is Jewish. *Cty. Defts' Ex.* B at 11. For awhile he rebelled against his religion but about ten years ago he started reconnecting to his religion and his heritage. *Id.* at. 12. In keeping with his faith, he has been eating a strictly Kosher diet since 2013. *Id.* at 15; *Resp.* at ¶ 3.

According to Plaintiff, to be Kosher:

the food must be blessed by a rabbi. *Cty. Defts' Ex.* B at 16. This typically occurs at the factory. *Id.*

the food cannot be stored with any food that is non-Kosher. *Cty. Defts' Ex.* B at 16. If the food is stored with non-Kosher food, the food becomes non-Kosher. *Id.*

the food cannot be prepared on the same surfaces that non-Kosher food is prepared on. *Cty. Defts' Ex.* B at 16.

if the food is going to be near non-Kosher food, it must be sealed. *Cty. Defts' Ex.* B at 16.

on the Sabbath (Saturday) you are not to have food that has been prepared by heat that day. *Cty. Defts' Ex.* B at 17.

utensils, pans, etc., used to prepare the food must be stored and washed separately from items used in the preparation of non-Kosher food. *Cty. Defts' Ex.* B at 19.

*Resp.* at ¶ 15; *Cty. Defts' Ex.* B at 16-18, 23; *see also Jewish Prisoner Services International, Jewish Dietary Law*, http://jpsi.org/resources/jewishpractices/ (accessed July 24, 2017) for a

-2-

more in depth discussion of the requirements for separate cooking, serving and storage utensils from non-Kosher foods as well as from each other by Kosher category.

During all times relevant to this case, all food services at the BCDC were provided under a contract with CBM. *Cty. Defts. Ex.* A at ¶ 7.  All preparation and planning is handled by CBM. *Id.*  All kitchen cutlery is under the control of CBM.  *Id.*  None of the County Defendants are authorized to prepare or plan the menu or diet for inmates at the BCDC.  *Id.* at ¶ 8.  None of the County Defendants were involved in cleaning or stocking the kitchen.  *Id.* at ¶ 9.  The BCDC is a "pork free facility in order to meet most religious dietary requirements."

By affidavit, Megan Rutledge, administrative assistant to the captain of the detention center, states:

> An inmate needing a special diet must state the request via the kiosk system.  The inmate is asked what diet is requested and why.  If the request involves a medical decision, that request is referred to medical services.  If the inmate requests a diet for religious purposes the kitchen is notified of the change.  If the inmate is found ordering commissary that does not fall within the guidelines, or consuming/trading food that does not fall within the guidelines, they are removed from the diet.

> If an inmate receives a tray and there is a problem, they must notify the deputies immediately, so that kitchen staff may be notified and a new tray made.  Deputies replace the tray in its entirety.

*Cty. Defts' Ex.* A at ¶ 11-12.

On December 3, 2015, Plaintiff completed a form that was sent to CBM indicating Plaintiff needed a Kosher diet.  *CBM's Ex.* B; *Resp.* at ¶ 28.  CBM staff signed the form on December 4, 2015.  *CBM's Ex.* B.  CBM has a Kosher diet that it utilizes.  *CBM's Ex.* C.  CBM provides information regarding a Kosher diet and the procedures for preparing and serving Kosher meals.  *CBM's Ex.* D.  The suggestions include buying certified Kosher foods whenever

-3-

possible.  Preparation procedures include:  instruction to label Kosher foods and to keep Kosher food separate from other food; not allowing the food to touch the counter top; using bulk items is approved but only if the full container can be designated for Kosher diets only; rinsing fresh fruit and vegetables using a gloved hand and insuring the food items do not touch the sink, spigot, counter top, or any cleaning utensil; putting the fruit or vegetable directly into a Styrofoam container or saran wrap;  making sure any pans or utensils are hand-washed and kept in a sterile bag that has not been used for any other purpose.  *Id.*

By affidavit, Carolyn Ellis, district manager for CBM, states it is her understanding the Kosher diet menu followed by CBM met all religious dietary restrictions.  *CBM's Ex.* E at ¶¶ 4 & 8.  She also states that the Kosher guidelines for food preparation meet all religious restrictions.  *Id.* at ¶ 9.  She asserts that it is "CBM's policy to take all reasonable steps to provide a properly prepared Kosher meal consistent with the appropriate religious dietary restrictions, for inmates who have taken the proper steps to request a Kosher meal." *Id.* at ¶ 11.  She asserts CBM attempted to timely address all Plaintiff's concerns.  *Id.* at ¶ 13.

Ms. Ellis notes that there were two other inmates incarcerated at the BCDC over the period Plaintiff was there who were on a Kosher diet.  *CBM's Ex.* E at ¶ 15.  To her knowledge, the other inmates did not file grievances regarding their Kosher meals.  *Id.* at ¶ 16.  She asserts that "[t]he meals for inmates on a Kosher diet are prepared using Kosher certified food." *Id.* at ¶ 18.

Ms. Ellis indicates the Kosher foods are stored on a separate shelf in the walk-in refrigerator.  *CBM's Ex.* E at ¶ 19.  Utensils and pans used to prepare Kosher meals are stored in a container with a lid and kept in the office.  *Id.* at ¶ 20.  This includes a spoon and measuring

cup reserved and used only for the preparation of Kosher meals. *Id.* at ¶ 21. CBM also has some plastic utensils and plastic containers used to prepare and store Kosher food. *Id.* at ¶ 22. "It is CBM's policy to re-wash, by boiling and re-purifying, any utensils or equipment reserved for preparation of Kosher meals if they are accidently used for other purposes." *Id.* at ¶ 23; *see also CBM's Ex.* J.

Ms. Ellis notes there are also multiple Kosher items available at the commissary that inmates may purchase to supplement their Kosher diet. *CBM's Ex.* E at ¶ 24; *CBM's Ex.* G. Plaintiff states he never saw this list until after he filed this lawsuit. *Resp.* at ¶ 29. The only commissary order placed by the Plaintiff included two non-Kosher items, cream cheese w/jalapenos and hot & spicy vegetable ramen. *CBM's Ex.* H. Plaintiff testified there was no list showing if the items were Kosher or not. *Resp.* at ¶ 30. In any event, he states the items were purchased for his roommate. *Id.* at ¶¶ 30-31. His roommate had given him coffee so Plaintiff indicates he paid him back with these commissary items. *Id.* at ¶¶ 32-33.

Plaintiff submitted a series of inmates/grievances about his food not being Kosher. A chronological summary of the grievances follows:

●On December 22, 2015, Plaintiff complained he was forced to eat a meal that did not meet his religious requirements. He stated he was told it was the nurse who changed his diet. He stated there had been numerous violations in the preparation of his food. He indicated he had been served oranges that had been cut with a knife that had hot dog pieces on it. Lietenant Holt asked what religious diet he was referring to. Plaintiff did not respond. In his response, to the summary judgment motion, Plaintiff states Lieutenant Holt closed this grievance before he had a chance to respond. *Resp.* at ¶ 35.

●On December 26, 2015, Plaintiff complained that he did not believe the powdered milk he was receiving was Kosher. Lieutenant Holt contacted Carolyn Ellis of CBM. She said the powdered milk was Kosher and was provided to Plaintiff in a Styrofoam cup. She asked kitchen staff to make sure his name was

on the cup.  In his response, Plaintiff states his milk was served in the same cups all other inmates received until February when he started getting it in a Styrofoam cup.  *Resp.* at ¶ 36.

● On December 28, 2015, Plaintiff apparently complained about the substitution of a slice of cheese in place of peanut butter.  Carolyn Ellis advised Lieuteant Holt that there was a shortage of peanut butter and that a slice of cheese was a suitable substitution for peanut butter.

● On December 31, 2015, Plaintiff stated he had no idea about the kitchen practices but does know that he found an orange cut in half with bits of hotdog on it.  Lieutenant Martinez asked if Plaintiff had shown that to a deputy.

● On December 31, 2015, Plaintiff submitted another grievance about the deputies handing out food with no gloves on.  Lieutenant Martinez responded that trustees hand out the food and they do wear gloves.

● On January 2, 2016, Plaintiff asked what he needed to do to have his religious laws followed.  Lieutenat Martinez asked what Plaintiff's religion was.  Plaintiff responded that it was the Sabbeth and he was not supposed to have food prepared with heat.  Lieutenant Martinez responded asking what Plaintiff meant by "prepared with heat."

● On January 6, 2016, Plaintiff said he had "tried every thing that I can think of to get my Kosher diet straight, at least one meal a day something is not right.  I don't want to complain but its getting old. [T]his morning my fruit was cut and I have to hear the deputy talk trash, my religion is not a joke."  Lieutenant Holt said he understood the Plaintiff's concern and would talk with CBM kitchen staff.  Carolyn Ellis replied to Lieutenant Holt's inquiry by stating she would get with her staff to "discuss procedures for preparing the Kosher meal.  Any food item that needs to be cut is done with a knife that is for Kosher food prep only.  I will talk with them to insure this is being done."  In his response, Plaintiff indicates his fruit does not need to be cut and he knew a non-Kosher knife was used because there were pieces of hot dog in the middle of his orange.  *Resp.* at ¶ 338.

● On January 7, 2016, Plaintiff said he wanted bread again instead of the cold corn tortillas.  Tiffany Devore, of CBM, asked what he was needing.

● On January 8, 2016, Plaintiff said he got uncooked corn tortillas with every meal.  He indicated it was almost impossible to eat the tortillas.  He said he wanted to have bread back.  Lieutenant Holt said he would forward this to CBM.

-6-

●On January 9, 2016, Plaintiff stated he was getting uncooked corn tortillas. He asked if Lieutenant Holt had ever tried to eat them in this manner. Plaintiff also asked that this be forwarded to the United States Marshal Service (USMS). Lieutenant Holt responded that he had forwarded the grievance to kitchen staff. Plaintiff was told that if he wanted to contact the USMS, he could write a letter.

●On January 11, 2016, Plaintiff complained of receiving uncooked corn tortillas with his lunch. Lieutenant Holt forwarded the concern to the kitchen. Carolyn Ellis replied that she had consulted with her dietary department and was told that serving a cold corn tortilla is within the food and safety guidelines and also followed all nutrition and religious requirements.

●On January 11, 2016, Plaintiff complained that kitchen staff apparently did not like him bringing up issues regarding his Kosher diet. He indicated he received a tray with half portions on it. When he showed the tray to a deputy, Plaintiff said he just smirked. Plaintiff stated that he really believed he was being punished for his religious beliefs. He asked what he needed to do to get the kitchen in compliance. In response, he was told the Captain was looking into it.

●On January 12, 2016, Plaintiff wrote that once again something was wrong with his Kosher meal and that when he showed it to the deputy he responded: "Don't come to my house to eat." Lieutenant Holt responded by asking what was wrong with the meal. Plaintiff replied that half an orange was cut with a knife, there was no celery and no milk and every time he showed a deputy he got grief from them. He also stated that since he had started complaining he was getting smaller portions. Lieutenant Holt passed the complaint to Carolyn Ellis who indicated that the orange had been cut with the Kosher knife. There was no celery put on his dinner tray. The milk was put in a Styrofoam cup and once it leaves the kitchen they have no control over it. If Plaintiff did not receive his milk, she indicated the deputy should have notified the kitchen and they would be happy to replace it.

●On January 12, 2016, Plaintiff wrote that cold tortillas were different from uncooked tortillas.

●On January 13, 2016, Plaintiff wrote that he was getting punished for complaining about the uncooked corn tortillas by being served extremely small portions. He indicated he showed the deputies the small portions. Further, he said he was served the same meal for over a month with the only exception being on three occasions he received a different rice. Lieutenant Holt responded that they had already addressed the cold corn tortillas issue and that it was a sufficient food source and within guidelines. He forwarded Plaintiff's grievance to CBM. Carolyn Ellis responded: "His tray was correctly portioned at lunch today. I

personally cooked the rice and observed my cook serving his tray to ensure proper portioning and to train her further in making sure his meals are correct. I also instructed her to keep his entree on the stove and serve at the very last minute so that his tray would still be very warm when received in hopes that he understands we are taking care of his religious needs in order to create less issues with this inmate. It is our goal to ensure that Mr. Fisher receives his tray as specified for his Kosher and religious needs."

● On January 13, 2016, he asked for the kitchen to be told not to put the corn tortillas on his tray. He said he was ok with the fact they would not put bread on the tray like they used to. He said he found it offensive and was over all the problems it caused. Lieutenant Holt forwarded the grievance to Carolyn Ellis. She replied that she could not leave the tortillas off his tray as she had to meet the dietary requirements. She said Plaintiff was free to throw them away.

● On February 6, 2016, Plaintiff submitted a grievance stating he had been given a tray that morning that was not Kosher. Lieutenant Garner forwarded the grievance to Carolyn Ellis. Carolyn Ellis responded stating that four Styrofoam trays were made up that morning one of which was Kosher. Her guess was that a deputy gave Plaintiff the wrong tray when passing out the meals. She noted that kitchen staff was not there to ensure the tray was taken to the correct person. Further, she indicated the tray would have been replaced had the kitchen staff been notified. She stated that kitchen staff had been advised that someone came and took three oranges out of the cooler and gave to Fisher. She did not know if he accepted the oranges.

● On February 8, 2016, Plaintiff submitted a grievance about being given three oranges instead of his Kosher meal. Lieutenant Holt responded that he would inform the kitchen about the complaint. Carolyn Ellis responded that CBM staff did not send out the oranges. "For the meal that he didn't receive his Kosher meal in a Styrofoam tray, we believe that it was passed out as a suicide/safety tray. We made four Styrofoam trays one of which was for inmate Fisher and the other three for safety/suicide. Once they are made, we put the trays on the carts with the . . . in the walk in cooler. The trays are labeled to be handed out to the inmate accordingly." Sergeant Luper was asked if he knew what had happened. He replied: "They did not make Mr. Fisher the correct tray for breakfast. We did not have any kitchen staff on premises. I went and retrieved three oranges from the cooler, and advised Mr. Fisher that was the best I could do for then."

● On February 15, 2016, Plaintiff asked why he was on a vegetarian diet. He said he clearly made a request for a Kosher diet he said was not being properly served. In response, Deputy Darner said he would speak with the kitchen.

-8-

● On February 16, 2016, Plaintiff wrote that once again his meal was "messed up." Plaintiff indicated he had quit sending messages "because I have been plain beat down with the lack of response from who ever is in charge of the kitchen." He stated he was told that morning that he had to drink water with his cereal because his milk was not prepared. He also noted that his food was always cold and always the same way. Lieutenant Holt responded that he needed to have specific details about what was wrong in order to look into it. Lieutenant Holt said if Plaintiff refused his tray that it was a choice he was making and not the detention center violating his rights. Plaintiff replied that he refused the tray because he was told to eat it with water. Carolyn Ellis said she needed to know what was messed up so she could speak with her kitchen staff. She indicated the diet was repetitive but that it was a Kosher meal approved by the dietary department and that Plaintiff was receiving all daily requirements.

● On February 16, 2016, Plaintiff asked why he did not get fruit with his diet. Lieutenant Holt said he would forward the grievance to kitchen staff.

● On February 16, 2016, Plaintiff asked that his issue be forwarded to the USMS. He complained that his meals were not Kosher and said: "no one else has to eat their cereal with water, do they?" In response, Lieutenant Darner noted the Plaintiff had refused his milk that morning and that the kitchen has assured him that Plaintiff was getting Kosher meals.

● On February 16, 2016, Plaintiff asserted that he was not getting Kosher meals. He suggested that kitchen staff google Kosher. He again asked that his grievance be forwarded to the USMS. Deputy Darner responded that Plaintiff was receiving Kosher meals.

● On February 16, 2016, Plaintiff stated he made numerous complaints about his religious rights not being met. He stated the responses he was given did not make sense. He wanted to know why someone with rank would not come and discuss the matter with him. With respect to the milk, he said it came in a cup that was washed with all other cups. This made it non-Kosher. Deputy Darner responded that he would speak with the Plaintiff.

● On February 16, 2016, Plaintiff submitted a grievance stating he had refused another meal because it was not Kosher. Deputy Darner replied that it was a Kosher meal and was on the list for approved Kosher diets. Deputy Darner said the meal was prepared by a registered dietician off a Kosher menu that CBM used specifically.

-9-

●On February 19, 2016, Plaintiff stated he would like to observe Sabbath meals. Deputy Darner replied that CBM indicated he would need to request a Sabbath day meal tray.

●On February 20, 2016, Plaintiff complained he had been served a rotten carrot. When he showed it to a deputy, he merely responded that he did not work in the kitchen. Plaintiff said he was merely following instructions to show a deputy what was wrong with a tray. Deputy Martinez responded that he would speak to kitchen staff about this.

●On February 21, 2016, Plaintiff said he could not eat his breakfast because it was not prepared in accordance with the laws of his religion. He said the kitchen did not care if he ate or not. He asked that his grievance be forwarded to the USMS. Lieutenant Holt responded that he had contacted the USMS.

●On February 21, 2016, Plaintiff submitted a grievance saying that he was served a "meal with a spoon that was washed with all the other stuff therefor it was not Kosher." He also noted his beans were not even half cooked. When he showed the deputies, he said they just responded with comments like: "I don't work in the kitchen." Plaintiff asked that his grievance be forwarded to the USMS. Lieutenant Holt responded that he would send the grievance to kitchen staff.

●On February 21, 2016, Plaintiff complained that he had so many violations of his religious meals. He said his lunch had been served with an item on the tray that tainted the whole thing. When he told deputies, Plaintiff said he was met with severe indifference. He stated he felt like he was being punished by whoever ran the kitchen. Lieutenant Holt noted he had taken every request seriously and inquired with kitchen staff about them. He said he would forward this grievance to kitchen staff.

●On February 21, 2016, Plaintiff said he once again received a meal that was not Kosher. In response, Lieutenant Holt noted the Plaintiff had been released.

●On February 22, 2016, Plaintiff said he was once again not eating another meal because of disregard of the basic rules that govern preparation of his meals. Lieutenant Holt responded that every one of his concerns were taken seriously. He stated that because of the nature of the meals they were repetitive but Kosher. Lieutenant Holt stated he was forwarding the grievance to the kitchen.

●On February 22, 206, Plaintiff explained that once a spoon is washed with other non-Kosher items, the spoon becomes non-Kosher. Deputy Monday replied that Plaintiff had been released.

●On February 22, 2016, Plaintiff asked why he received the same items for every meal. He said he was served beans and rice with each meal. He stated he did not get any fruit so he did not know where his vitamins were coming from. He also said he got diabetic jelly with each meal. In response, Lieutenant Holt noted Plaintiff had been released.

*Cty. Defts' Exs.* A-3 & A-4; *see also CBM's Exs.* F, I, & K.

From these grievances and his deposition, it is clear Plaintiff believed the food at the BCDC was not Kosher because: (1) They would put a spoon from the non-Kosher side of the kitchen on his tray. He knew this is what occurred because two of the trustees that worked in the kitchen told him this occurred. *Cty. Defts' Ex.* B at 18. (2) All food is stored together in a cooler. He knew this because a trustee told him. *Id.* at 19-20. (3) The "Kosher utensils" were washed in the same dishwasher as non-Kosher items making them unclean. *Id.* at 19. (4) All food was cooked on the same surfaces. *Id.* at 20. (5) The kitchen has not been blessed by a rabbi. Plaintiff asked several people and no one believed a rabbi had blessed the kitchen *Id.* at 21; (5) The food was not always sealed, or sealed properly, and came into contact with other food making it non-Kosher. *Id.* at 23-24 & 28. and (6) They would cut his fruit on a table where they were cutting everyone else's fruit and/or use the same knife. One time his fruit even had a piece of hot dog in it. *Id.* at 24-25.

Plaintiff never personally watched the preparation of the food. *Cty. Defts' Ex.* B at 29. He based his opinion that the food was not Kosher primarily on what he heard from trustees, who worked in the kitchen, and deputies. *Id.* With respect to food coming to him unsealed, he did personally witness that as well as times his food had pieces of food from the regular line in it. *Id.* at 30-31. Towards the end of his incarceration, CBM did seal his meals; however, they still

were sealing a spoon inside it that was non-Kosher. *Resp.* at ¶ 56. Plaintiff believes they should have had a separate Kosher kitchen. *Cty. Defts' Ex.* B at 33.

Plaintiff estimated he missed about twenty meals over the course of the two and one-half months he was incarcerated at the BCDC. *Cty. Defts.' Ex.* B at 26. Plaintiff lost eleven pounds as a result of not being able to eat some of the meals sent to him. *Id.* at 25-26; *see also Resp.* at ¶ 57.

Plaintiff suffered mental anguish as a result of the conduct of the Defendants. *Cty. Defts' Ex.* B at 46. He had previously been diagnosed with anxiety and Post Traumatic Stress Disorder. *Id.* In the past, he was prescribed Valium and took it as needed. *Id.* at 47.

With respect to Sergeant Sharp, Plaintiff testified that he and the nurse just decided to take him off the Kosher diet because he was not eating. *Cty. Defts' Ex.* B at 34; *see also Resp.* at ¶ 20. He was told: "If you don't eat this, we're going to put you in a suicide - - suicide smock because it's suicidal tendencies." *Cty. Defts' Ex.* at 34. On several occasions Plaintiff said Sergeant Sharp came and talked to him about the issues Plaintiff was having with preparation of the food. *Id.* In Plaintiff's opinion, Sergeant Sharp violated policy by removing Plaintiff from the Kosher diet. *Resp.* at ¶ 14.

That same night, Sergeant Sharp said it was a mistake to have done that. *Cty. Defts' Ex.* at 34. Plaintiff was put back on the Kosher diet. *Cty. Defts' Ex.* B at 35. He was just off it for one day. *Id.*; *see also Resp.* at ¶ 21. Plaintiff is bringing a personal capacity only claim against Sergeant Sharp. *Resp.* at ¶ 25.

Plaintiff testified Deputy Foster pulled him out of the pod and told him he was becoming a pain in Deputy Foster's a-- because he was not going to eat the food. *Cty. Defts' Ex.* B at 35.

-12-

Deputy Foster also said Plaintiff was "lucky that my kind even got to eat food." *Id.*  He was denied a meal that night. *Id.*  Plaintiff believes this occurred on February 21, 2016. *Id.* at 36. Plaintiff believed Deputy Foster went against policy "by pulling me out of the unit and yelling at me for my religious beliefs and customs." *Resp.* at ¶ 12.  There were two trustees and another deputy present during this incident. *Cty. Defts' Ex.* B at 36-37.

With respect to Deputy Devore, Plaintiff testified he was present with Deputy Foster on February 21, 2016. *Cty. Defts' Ex.* B at 37.  He also made "Jew jokes" on several occasions. *Id.* One day, Plaintiff testified Deputy Devore "asked me what the difference between a Jew and a pizza was, and he told me a pizza didn't scream when you put it in the oven." *Id.* at 37-38.  The last day Plaintiff was at the detention center, every time they walked past each other, "he pretended to sneeze and said, "A-Jew, A-Jew." *Id.* at 38; *Resp.* at ¶ 4-5. Deputy Devore did not threaten to harm the Plaintiff but Plaintiff viewed the jokes as being malicious. *Cty. Defts' Ex.* B at 38.

Plaintiff testified he suffered mental anguish and developed anxiety issues as a result of the conduct of Sergeant Sharp, Deputy Foster, and Deputy Devore's conduct. *Resp.* at ¶ 6 & 26. He was given Wellbutrin for his anxiety issues. *Id.* at ¶ 6.  He did not suffer any physical injury as a result of their treatment. *Id.* at ¶ 26.

With respect to CBM, Plaintiff testified his claim was related to its inability to provide him a properly prepared Kosher diet. *Cty. Defts' Ex.* B at 37.  He indicated they used non-Kosher utensils, prepared his food on the same surfaces as other food, stored the food with non-Kosher items, and in other ways during the preparation rendered the food non-Kosher.

-13-

### 2.  Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." <u>National Bank of Commerce v. Dow Chemical Co.</u>, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." <u>National Bank</u>, 165 F.3d at 607 (<u>citing</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." <u>Id.</u> (citing, <u>Metge v. Baehler</u>, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3.  Discussion

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." <u>Turner v. Safley</u>, 482 U.S. 78, 84 (1987).  "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348 (1987); <u>see also Cruz v. Beto</u>, 405 U.S. 319 (1972).  However, this right is not without limitation.  The Supreme Court has recognized  "incarceration brings about the necessary withdrawal or limitation of many

-14-

privileges and rights." O'Lone, 482 U.S. at 348.   Like with the freedom to receive ideas, "the free exercise right is limited insofar as a prisoner's adherence to religious practices may be regulated by prison authorities, so long as such regulations are' reasonably related to legitimate penological interests.'" Murphy v. Carroll, 202 F. Supp. 2d 421, 424 (D. Md. 2002)(quoting Turner, 482 U.S. at 89; O'Lone, 482 U.S. at 348-349; Cruz, 405 U.S. at 322)); see also Thomas v. Gunter, 32 F.3d 1258, 1259-60 (8th Cir. 1994).

"A prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so." Murphy v. Missouri Dept. of Corr., 372 F.3d 979, 983 (8th Cir. 2004).  Specifically, it has been held that inmates are entitled to a diet sufficient to sustain health and satisfy religious dictates.  See McElyea v. Babbitt, 833 F.2d 196, 198 (9th Cir. 1987); see also Love v. Reed, 216 F.3d 682, 689 (8th Cir. 2000)(inmates are entitled to reasonable accommodation of religious dietary needs).

In order to present a valid First Amendment claim in this context, Plaintiff has the "burden of establishing that the alleged religious belief or ritual in question [a Kosher diet] is based on a teaching of the religion [Jewish], that [Plaintiff's] belief in the teaching is sincerely held, and that the governmental action in question actually infringe[d] upon [his] free exercise of this belief." Goff v. Graves, 362 F.3d 543, 547 (8th Cir. 2004).   It is without doubt that the desire to keep Kosher is rooted in the Jewish faith.  Love, 216 F.3d at 688.

### (A). CBM's Motion for Summary Judgment

CBM maintains it is entitled to summary judgment because: (1) there is no genuine issue as to any material fact indicating that the policies and practices of CBM demonstrate deliberate indifference in connection with the provision of Kosher meals at the BCDC; (2) there is no

evidence presented by Plaintiff of a substantial burden on his ability to practice a sincerely held religious belief; (3) Plaintiff cannot show CBM violated his constitutional rights in its individual capacity, as he has not presented any evidence that any employee of CBM was deliberately indifferent to his religious dietary needs; and (4) the CBM employees are entitled to qualified immunity, as its employees were acting in the course of their duties, and there is no evidence of deliberate indifference to Plaintiff's religious dietary needs.

### Official Capacity Claims

CBM argues the Plaintiff has failed to point to any unconstitutional policy, custom, or practice that was the moving force behind the alleged constitutional violations.  I agree.

In <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658 (1978), the Court held that a municipality could not be held liable simply because it employed the tortfeasor.  *Id.* at 691.  In other words, a *respondeat superior* theory of liability did not apply.  *Id.*  Instead, liability was dependent on official policy or action.  <u>Szabla v. City of Brooklyn Park, Minn.</u>, 486 F.3d 385, 389 (8th Cir. 2007)(citations omitted).

Similarly, "a corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies.  The proper test is whether there is a policy, custom or action by those who represent official policy that inflicts injury actionable under § 1983" <u>Sanders v. Sears, Roebuck & Co.</u>, 984 F.2d 972, 975-76 (8th Cir. 1993)(citation omitted).

In this case, Plaintiff has not alleged that CBM had a policy of not providing religious meals to inmates in general or of not providing Kosher meals to Jewish inmates in particular. In fact, he concedes CBM had a Kosher diet, that he was put on the diet upon his request, and that CBM provided its staff with information regarding Kosher diets and procedures to be used

in preparing and serving Kosher food.  Instead, he maintains they failed to properly adhere to the Jewish dietary laws in regard to the preparation of the food.  This failure was what resulted in Plaintiff's injury.  It does not demonstrate the existence of any unconstitutional custom or policy. CBM is entitled to summary judgment on any official capacity claims.

### Sincerely Held Religious Belief

CBM questions the sincerity of Plaintiff's religious belief based on the single commissary order he placed for two items that were not Kosher.  Murphy, 372 F.3d at 983 (threshold issue of whether the challenged government action infringes upon a sincerely held religious belief is a factual determination).  We find this an insufficient basis to challenge the sincerity of his religious beliefs.  First, Plaintiff states the commissary list did not state what items were Kosher. In his response, Plaintiff states he did not see a list with those designations until after this lawsuit was filed.  Second, Plaintiff provided a sworn statement indicating he purchased these two items for someone else.  Third, even if Plaintiff did eat these two non-Kosher foods, it is not alone sufficient to doubt his sincerity of belief that he needs a Kosher diet for religious reasons.  See e.g.,Grayson v. Schuler, 666 F.3d 450, 454 (7th Cir. 2012)("a sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance").  As we must take the facts in the light most favorable to the Plaintiff, we find no basis to question the sincerity of his religious belief based on a single isolated commissary order. Ochs v. Thalacker, 90 F.3d 293, 296 (8th Cir. 1996)("Courts must be cautious in attempting to separate real from fictitious religious beliefs"); see also Koger v. Bryan, 523 F.3d 789 (7th Cir. 2008)(for an observant Jew, demanding a Kosher diet is tantamount to "asking for accommodation of a religious exercise rooted in sincerely held beliefs").

AO72A
(Rev. 8/82)

**The Kosher Diet**

Plaintiff does not contend that CBM refused to provide him a Kosher diet.  Instead, he maintains it prepared the food in such a way as to violate the dictates of his religion, rendering the food non-Kosher.  Plaintiff bases his contention on statements made to him by various trustees, who he says were involved in food preparation and/or serving food, and statements made by deputies.  Additionally, he observed that his food was not always sealed, on one occasion his orange had bits of hot dog on it where it was sliced, on at least one occasion his milk was not served in a Styrofoam cup, he received smaller portions on some occasions, on one occasion he was told he had to drink water with his cereal because his milk had not been prepared, on several occasions a spoon he believed was non-Kosher was placed on his tray, and on at least one occasion received a non-Kosher tray.

Plaintiff never personally witnessed the preparation of the food and has no personal knowledge of how the Kosher food is stored or prepared in the BCDC.  Further, he has no knowledge as to what pans and other utensils are used, how they are stored, and how they are cleaned.  He provided no affidavits from the trustees or the deputies.

In contrast, CBM has provided affidavits setting forth how the Kosher food was prepared and stored separately; pans and utensils were used only for Kosher food; these items were hand washed and did not go through the dishwasher with non-Kosher utensils; and the items were then stored in a sealed plastic tub.  If a utensil was inadvertently used for a non-Kosher food item, it was boiled to purify it.  The Kosher food was placed on a Styrofoam tray and sealed with plastic wrap.

-18-

Viewing the record in the light most favorable to the Plaintiff, we find no genuine issue of material fact as to whether CBM substantially burdened Plaintiff's exercise of his religious rights. CBM employed reasonable measures to maintain a division between Kosher food and non-Kosher food and to ensure it was prepared in accordance with religious dietary laws. There is no evidence before the court that reasonably suggests that Plaintiff's sincere religious beliefs were substantially burdened by the meals provided. CBM is entitled to summary judgment in its favor.

### Qualified Immunity

Having found that the facts do not make out a constitutional violation, Defendant is entitled to qualified immunity. See, e.g., Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### (B). Benton County Defendants' Motion for Summary Judgment

The County Defendants contend they are entitled to summary judgment on the following grounds: (1) harassment and verbal comments do not state a constitutional claim; (2) the County Defendants did not substantially burden Plaintiff's exercise of his faith; (3) the County Defendants are entitled to qualified immunity; and (4) there is no basis for official capacity liability.

### Harassment and Verbal Comments

As much as the Court finds it abhorrent that detention center officials would make fun of and harass an inmate because of his religious beliefs, such harassment, name calling, and use of offensive language does not violate the constitution. See e.g., Kurtz v. City of Shrewsbury,

-19-

245 F.3d 753, 758-59 (8th Cir. 2001)("Furthermore, any alleged verbal harassment, in the form of threats and unflattering remarks directed at plaintiffs, does not rise to the level required to establish a constitutional violation"); King v. Olmsted, 117 F.3d 1065, 1067 (8th Cir. 1997)(verbal harassment actionable only if it is so brutal and wanton that it shocks the conscience, or results in a deprivation of constitutional rights); McDowell v. Jones, 990 F.2d 433, 434 (8th Cir. 1993)(inmate's claims of general harassment and of verbal harassment were not actionable under § 1983). The Benton County Defendants are entitled to summary judgment on this claim.

### The Kosher Diet

The Benton County Defendants contend they cannot be held liable for the preparation of the Kosher diet as CBM was completely in charge of that aspect. They note that they passed all concerns voiced by the Plaintiff onto CBM and made sure an adequate explanation was given. The Court agrees that the Benton County Defendants cannot be held liable for the diet prepared and served to the Plaintiff. None of them were involved in anyway with the preparation of the food.

Next, is the issue of Sergeant Sharp's liability for taking the Plaintiff off a Kosher diet for a single day. Sergeant Sharp allegedly did this because Plaintiff was refusing food which was viewed as a self-destructive behavior. After this occurred. Sergeant Sharp apologized to the Plaintiff and said having taken him off the diet was a mistake.

This is insufficient to create a genuine issue of material fact as to whether Plaintiff's exercise of his religious belief was substantially burdened. This was an isolated incident that did not reoccur during Plaintiff's incarceration at the BCDC.

-20-

**Qualified Immunity**

Having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity.  See, e.g., Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

**Official Capacity**

The Benton County Defendants argue that the Plaintiff has failed to point to unconstitutional policy, custom, or practice that was the moving force behind the alleged constitutional violations.  I agree.

In Monell, 436 U.S. at 691, the Court held that a municipality could not be held liable simply because it employed the tortfeasor.  In other words, a *respondeat superior* theory of liability did not apply.  *Id.*  Instead, liability was dependent on official policy or action.  Szabla v. City of Brooklyn Park, Minn., 486 F.3d 385, 389 (8th Cir. 2007)(citations omitted).

In this case, Plaintiff has not alleged that Benton County had a policy of not providing religious meals to inmates in general or of not providing Kosher meals to Jewish inmates in particular.  Instead, his claim is mainly based on the preparation of the food by CBM.  He has not pointed to any custom, policy, or practice of the County Defendants.   The Benton County Defendants are entitled to summary judgment on any official capacity claims.

**4.  Conclusion**

For the reasons stated, I recommend that CBM's motion for summary judgment (Doc. 61) be **GRANTED** and that the Benton County Defendants' motion for summary judgment (Doc. 64) be **GRANTED.**  This case should be **DISMISSED WITH PREJUDICE.**

-21-

The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 26th day of July 2017.


/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE

-22-